IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-07119 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| NESTLÉ USA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, Plaintiff Stanley Johnson alleges that his former employer, Defendant Nestlé USA ("Nestlé"), discriminated against him on the basis of his race when it declined to advance him to the next stage of an in-house training program. Nestlé has filed a motion for summary judgment. (Dkt. No. 188.) For the reasons stated below, Nestlé's motion is granted.

**BACKGROUND**

The Court takes the following facts from the parties' respective submissions under Local Rule 56.1. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSF"), Dkt. No. 198-2; Def.'s Resp. to Pl.'s Statement of Material Facts ("DRPSF"), Dkt. No. 200; Def.'s Suppl. Resp. to Pl.'s Statement of Material Facts ("DSRPSF"), Dkt. No. 207.) Unless noted otherwise, the facts are undisputed.[1]

---

[1] Johnson raises a few general objections to Nestlé's statement of facts and its supporting evidence. For one thing, he argues that Nestlé often includes multiple factual assertions in a single paragraph as a means to avoid the 80-paragraph limit in Local Rule 56.1(d)(5). Relatedly, he contends that Nestlé does not identify with specificity the factual assertions to which its record citations correspond as required under Local Rule 56.1(d)(2). But the Court finds that any such deviations from the Local Rules are not sufficiently egregious to warrant the relatively harsh remedy of striking material, as Johnson requests. *See*

Nestlé is a nationwide producer of food and beverages. (PRDSF ¶ 1.) In 2016, Johnson, who is Black and had previously served as a production worker at Nestlé's former facility in Franklin Park, Illinois, sought a transfer to a position as a Boiler Room Helper at the same facility. (*Id.* ¶¶ 2–3, 7, 9.) The Boiler Room Helper position was part of Nestlé's in-house training program ("Training Program"), which was meant to train employees to become licensed Operating Engineers over the course of approximately two years. (*Id.* ¶¶ 12, 22.)

In their capacity as Boiler Room Helpers, trainees helped oversee the operation of the boiler room. (*Id.* ¶ 13.) Their job responsibilities included working with hazardous chemicals that could pose a danger to the entire facility. (*Id.* ¶ 14.) Safety was therefore paramount. (*Id.* ¶ 15.) To that end, the first ninety days of a Boiler Room Helper's service were probationary so that Nestlé would have a chance to evaluate whether they were a good fit for the position. (*Id.* ¶ 17.) During this initial period, a trainee could be laid off, assigned to a different position, or discharged as Nestlé saw fit. (*Id.* ¶ 21.) After ninety days, however, the probationary period ended, and the trainees became union members. (*Id.* ¶ 25.) From that point, Nestlé could only discipline Boiler Room Helpers in such a manner "for cause," and its decisions were subject to a formal grievance process. (DRPSF ¶ 8.)

After Johnson interviewed with, among others, Carl Kumlin, who served as the Industrial Services Manager at the Franklin Park facility, Nestlé granted his transfer request. (PRDFS ¶¶ 9–

---

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[A] district court has broad discretion to require strict compliance with Local Rule 56.1."); *see also Ragan v. BP Prod. N. Am., Inc.*, No. 1:17 C 9208, 2019 WL 13171295, at *1 (N.D. Ill. Aug. 13, 2019) ("Where a party makes a good-faith effort to comply with the rule and properly organizes the relevant evidence with record support, we will not lightly disturb the litigation to create needless additional work for the Court and litigants or to privilege form over substance."). The Court's ability to fairly consider the record has not been impeded, and thus, in this circumstance, it finds a warning to be sufficient. Thus, Nestlé's counsel is cautioned to adhere to the Local Rules in the future.

10.) Johnson began working as a Boiler Room Helper on October 17, 2016. (*Id.* ¶ 24.) During the probationary period of the Training Program, Operating Engineers were supposed to provide on-the-job training to Boiler Room Helpers. (*Id.* ¶ 19.) Johnson received training from several Operating Engineers, including an Operating Engineer named John Hentz, who Johnson describes as his "primary trainer." (PRDSF ¶ 26; DRPSF ¶¶ 18, 26.) Johnson acknowledges that he chose to work with Hentz due to their preexisting friendship (PRDSF ¶ 52).[2]

Johnson was not the only Boiler Room Helper at the time. Two weeks before he started, a white trainee named Ray Kane had begun working as a Boiler Room Helper. (PRDSF ¶ 40.) At the outset of the Training Program, Kane had far more experience performing mechanical work than Johnson. (*Id.* ¶ 41.) Nonetheless, Johnson and Kane participated in many of the same events, such as training courses, during the Training Program. (*Id.* ¶ 42.) Johnson admits that he does not know many other specifics regarding Kane's training. (*Id.* ¶ 53.)

In December 2016, Kumlin asked the Operating Engineers to fill out identical written evaluation forms for both Johnson and Kane to assess their performance in the Training Program and determine whether they should advance past the probationary period. (*Id.* ¶ 57.) The reviews

---

[2] Johnson now claims he received training from Hentz, and no other Operating Engineer, based on the vague testimony of another Operating Engineer. (DRPSF ¶ 18.) But during his own deposition, Johnson listed many Operating Engineers other than Hentz who trained him. (LaSorsa Decl., Ex. H ("Johnson Dep.") at 55:3–56:5, Dkt. No. 198-10); *see also Goings v. Jacob*, No. 18 C 7218, 2022 WL 672740, at *3 (N.D. Ill. Mar. 7, 2022) (explaining that statements of fact must be "properly supported by the cited materials and . . . not otherwise disputed by the evidence raised by the opposing party"). Relatedly, Johnson's claim that certain Operating Engineers refused to train him (DRPSF ¶ 19) lacks evidentiary support. Johnson cites, in part, the deposition testimony of Julio Cintron, an Operating Engineer. But Cintron merely speculated that some of his colleagues did not "*want* to finish training" Johnson due to his "attitude," and he later clarified that Johnson "must have got[ten] complete training." (LaSorsa Decl., Ex. D ("Cintron Dep.") at 117:4–121:23, Dkt. No. 198-7 (emphasis added).) Johnson also cites his own deposition testimony that Cintron, who was on the same shift as Hentz, refused to work with Johnson. (Johnson Dep. at 45:5–23.) But as discussed above, Johnson admits he chose to be trained by Hentz instead of Cintron. (PRDSF ¶ 52); *see also Banks v. Chamberlain*, No. 3:18-CV-50282, 2021 WL 2529568, at *6 (N.D. Ill. June 21, 2021) (explaining that responses to statements of fact are binding "judicial admissions").

3

required the Operating Engineers to rank the trainees on a scale of one to four, with four being high, in a variety of categories; Johnson received an average score of 2.24 on nine reviews, and Kane received an average score of 3.52 on eight reviews. (*Id.* ¶¶ 64–65; *see also* Combs Decl., Ex. A ("Nestlé Documents") at 15–32, 130–45, Dkt. No. 191-1.) Some of the evaluations for Kane, in particular, were only turned in after his probationary period had ended. (DSRPSF ¶ 9.)

Whereas Kane advanced in the Training Program (*id.*), the same individuals who had granted Johnson's transfer request, including Kumlin, concluded that Johnson was a bad fit as a Boiler Room Helper, citing negative feedback regarding his performance during the probationary period (PRDSF ¶¶ 29–31). Nestlé states that, on January 13, 2017, Johnson was informed that he would be returning to his previous role as a production worker. (*Id.* ¶ 29.) This was two days before his ninety-day probationary period expired. (*Id.* ¶ 24.) Although Johnson does not contest the date he learned of Nestlé's decision, he nonetheless insists that he continued working as a Boiler Room Helper until January 17, at which point the probationary period had expired. (PRDFS ¶ 29; DSRPSF ¶ 10.)

Johnson grieved his removal through the union. (PRDSF ¶ 32.) When Nestlé denied the grievance, the union did not appeal. (*Id.*) But during the grievance process, Nestlé offered to extend Johnson's probationary period by sixty days, according to Nestlé, to give him another opportunity to show he would be a good fit as a Boiler Room Helper. (*Id.* ¶¶ 33–34.) Johnson contends that the correct framing of the offer is one for a new probationary period, as his first ninety-day period had already expired. Either way, Johnson declined the offer, and he ultimately returned to his position as a production worker. (*Id.* ¶¶ 34, 38.)

Johnson filed this lawsuit on October 19, 2019. (Compl., Dkt. No. 1). In his first amended complaint ("FAC"), Johnson names three Defendants: Nestlé and two entities that allegedly

4

purchased the Franklin Park facility from Nestlé in 2018 and employed Johnson thereafter. (FAC ¶¶ 4, 16–19, Dkt. No. 97.) In the FAC, Johnson claims that Nestlé subjected him to racial discrimination when it removed him from the Training Program, in violation of Title VII and 42 U.S.C. § 1981. (*Id.* ¶ 12.)[3]

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). While facts and reasonable inferences are construed in the light most favorable to the non-moving party, such "favor . . . does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotation marks omitted). The Court grants summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

---

[3] In its brief, Nestlé states that Johnson has raised a claim under the Illinois Human Rights Act based on the same allegations. (Def.'s Br. in Support of Mot. for Summ. J. at 3 n.1, Dkt. No. 189.) Johnson agrees in his response brief. (Pl.'s Resp. Br. at 9 n.2, Dkt. No. 204.) Although the original complaint contains documentation from the Illinois Human Rights Commission regarding Johnson's efforts to pursue this relief (Compl. at 8–23), the FAC does not reference such a claim. Regardless, the Court's analysis herein would apply equally to the claim under the Illinois Human Rights Act, assuming it were properly raised.

In the Seventh Circuit, "plaintiffs can rely on two frameworks to show discrimination." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). One is a "holistic approach" under which courts "look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Id.* (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The other, named after the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), entails a "burden-shifting" approach. *Vichio*, 88 F.4th at 691. The parties in this case focus on the *McDonnell Douglas* framework for Johnson's claims, so the Court does too. *See, e.g.*, *Wilson v. Aim Specialty Health*, No. 21 C 1929, 2023 WL 8372041, at *1 n.2 (N.D. Ill. Dec. 4, 2023) (explaining that courts review discrimination claims brought under Title VII, § 1981, and the Illinois Human Rights Act pursuant to the same standard). "In all cases, at the summary judgment stage, courts consider all evidence and determine whether a reasonable jury could find that the plaintiff suffered an adverse action because of his protected characteristics." *Singmuongthong v. Bowen*, 77 F.4th 503, 508 (7th Cir. 2023).

The *McDonnell Douglas* framework first requires the plaintiff to show a prima facie case of discrimination by establishing the following elements:

> (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer.

*Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023) (internal quotation marks omitted). If the plaintiff does so, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal quotation marks omitted).

There is no dispute that Johnson, who is Black, is a member of a protected class. But Nestlé contends that Johnson has not satisfied the other three requirements of his prima facie burden. Likewise, it argues that Johnson presents no evidence to undercut the legitimacy of Nestlé's proffered explanation for declining to admit him in the Training Program on a non-probationary basis—namely, Johnson's poor performance during the probationary period.

At the outset, the Court considers whether Johnson suffered an adverse employment action for purposes of the prima facie case. It then considers whether Johnson has provided sufficient comparator evidence. Finally, the Court addresses the legitimacy of Nestlé's proffered explanation for its decision; in doing so, the Court considers the remaining requirement of the prima facie case, which asks whether Johnson was meeting Nestlé's legitimate expectations. *See Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) ("Where legitimate expectations and pretext overlap, we can be more efficient by addressing both together . . . .").

### I. Adverse Employment Action

As part of his burden to establish a prima facie case of discrimination, Johnson must show that Nestlé undertook an adverse employment action, which refers to an action that "altered the terms or conditions of [his] employment." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). In the past, the Seventh Circuit has limited Title VII to employment actions that were "materially adverse." *E.g.*, *Bragg*, 58 F.4th at 274; *Porter*, 700 F.3d at 954. But in a recent Title VII case where the plaintiff's employer had forced her to transfer positions, the Supreme Court vacated the grant of summary judgment against the plaintiff on the grounds that lower courts had improperly required her to show that the transfer caused "significant" harm. *See Muldrow v. City of St. Louis*, 144 S. Ct. 967, 973–74 (2024). The Title VII provision at issue in *Muldrow* (and here) prohibits "discriminat[ion] against any individual with respect to" the "terms[] [or]

7

conditions" of her employment. 42 U.S.C. § 2000e-2(a)(1). Although this language refers to "some harm respecting an identifiable term or condition of employment," it imposes no requirement that the harm be "significant" or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow*, 144 S. Ct. at 974.

In line with this reasoning, the Supreme Court criticized the Seventh Circuit's rule that an adverse employment action must be "materially adverse." *Id.* at 973 n.1 (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). And there is no reason to limit the reasoning of *Muldrow* to position transfers given the Supreme Court's reliance on the general statutory text. *Id.* at 974–75. In short, per *Muldrow*, a plaintiff claiming employment discrimination under Title VII must "show only some injury respecting her employment terms or conditions" that "left her worse off, but need not have left her significantly so." *Id.* at 977.

The adverse employment action Johnson cites here is Nestlé's decision to deny his admission into the Training Program on a non-probationary basis following his ninety-day probationary period. In Johnson's view, Nestlé simply relegated him to his previous position outside the Training Program, reducing his salary in the process. Such a demotion would likely constitute an adverse employment action sufficient to support his claims, even according to the previously controlling requirement that the action be "materially" adverse. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013). But this version of events omits that Nestlé offered Johnson a sixty-day extension of his probationary period, which he rejected. Reframing the inquiry along those lines presents a closer question as to whether Johnson suffered an adverse employment action.[4]

---

[4] Whether the offer is construed as one for an extended probationary period, as Nestlé puts it, or as one for a new probationary period, in line with Johnson's view, does not affect the Court's analysis here.

For its part, Nestlé focuses on the fact that Johnson voluntarily declined its offer to extend the probationary period, arguing that he effectively resigned from the Training Program. To Nestlé's point, "[i]n the absence of circumstances suggesting a constructive discharge, an employee who voluntarily resigns cannot be said to have experienced an adverse employment action." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d 760. Johnson does not argue that he was constructively discharged, nor is there evidence in the record indicating that his "working conditions were 'so intolerable that a reasonable person would have felt compelled to resign.'" *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Therefore, Nestlé argues, Johnson did not suffer an adverse employment action.

But Johnson's rejection of the offer to extend his probation does not speak to whether the offer itself constituted an adverse employment action. In fact, the Seventh Circuit has "suggested that placing an employee on probation, in some cases, may constitute a materially adverse employment action." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n.31 (7th Cir. 2012). If anything, probation is more likely to suffice under the lenient standard from *Muldrow*. Also, the offer to extend the probationary period instead of granting unqualified admission to the Training Program resembles a failure to promote, which can support a Title VII claim. *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1041 (7th Cir. 2023); *see also Benchik v. Indiana Fam. & Soc. Servs. Admin.*, No. 2:19-CV-437-JPK, 2023 WL 1328358, at *7 n.8 (N.D. Ind. Jan. 31, 2023) (comparing an extended probationary period to a failure to promote under Seventh Circuit precedent). In the end, the Court must ask whether offering to extend Johnson's probationary period—thereby denying him non-probationary status—resulted in "some injury respecting [his] employment terms or conditions." *Muldrow*, 144 S. Ct. at 977.

The evidence reveals at least two key differences between employees in the Training Program on a probationary basis and those in the Training Program on a non-probationary basis. To start, Nestlé itself asserts that the probationary period did not entail training to serve as a Boiler Room Helper; during this phase, trainees simply learned how to operate Nestlé's equipment, which was a prerequisite to beginning the Boiler Room Helper training. (PRDSF ¶¶ 17–18.) So, by offering to extend the probationary period, Nestlé effectively prevented Johnson from furthering his training to become a Boiler Room Helper. This would likely suffice to support his claim under the previous "materially adverse" test, not to mention the *Muldrow* test. *See Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (explaining that "materially adverse employment action[s] can be categorized into three groups of cases," including a group for decisions that "the employee's career prospects thus impacting the employee's future wealth").

In addition, Nestlé admits that it needed "to follow a different process" to terminate probationary employees as compared to their non-probationary counterparts. (DRPSF ¶ 8.) Whereas probationary employees could be terminated at its discretion, terminations of non-probationary employees had to be "for cause" and were subject to a grievance process. Depriving Johnson of these employment safeguards by not admitting him to the Training Program on a non-probationary basis could constitute an adverse employment action. *Cf. Benchik*, 2023 WL 1328358, at *7 ("The extensions of probation subjected [the plaintiff] to different terms of employment, in the form of a lack of due process before he was fired.").

Accordingly, there remains a question of fact as to whether the offer to extend Johnson's probationary period (rather than allowing him into the Training Program on a non-probationary basis at that time) amounted to an adverse employment action. *See, e.g.*, *McDaniel v. Loyola*

*Univ. Med. Ctr.*, No. 13-CV-6500, 2019 WL 1281969, at *13 (N.D. Ill. Mar. 20, 2019) ("[T]he Court cannot say as a matter of law that the decision to place Plaintiff on probation was not an adverse employment action."). Nestlé's therefore is not entitled to summary judgment on this basis.

## II. Similarly Situated Individual

The parties next dispute whether Johnson has satisfied the fourth requirement of the prima facie case, which requires him to "show that similarly situated employees (comparators) received more favorable treatment than him." *Avancez*, 95 F.4th at 539; *see also Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005) (explaining in the failure-to-promote context that the plaintiff must "establish that the person promoted in her place was similarly situated at the time of the alleged discrimination against her").

Satisfying this element requires the plaintiff to "show the purported comparator was directly comparable to her in all material respects so as to eliminate other possible explanatory variables" for the uneven treatment. *Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (internal quotation marks omitted). "Relevant factors include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 226 (7th Cir. 2017) (internal quotation marks omitted). This is a "flexible, common-sense, and factual" inquiry. *Id.* at 225 (internal quotation marks omitted). At bottom, the plaintiff and the comparator must share enough characteristics "to enable a meaningful comparison." *Dunlevy v. Langfelder*, 52 F.4th 349, 354 (7th Cir. 2022) (internal quotation marks omitted).

11

Johnson attempts to satisfy the comparator requirement through Ray Kane, the white Boiler Room Helper who was fully admitted to the Training Program following his probationary period. The parties appear to agree that Johnson and Kane entered the Training Program at roughly the same time, were purportedly subject to the same evaluation standards, and had the same ultimate supervisor (Carl Kumlin). Johnson does not dispute, however, that Kane "had far more mechanical experience than" him at the beginning of the Training Program, including:

> two years of coursework toward a certification in heating, ventilation and air conditioning, and courses in electrical, control circuitry, wiring and blueprint reading; two years and completion of core structure for an apprenticeship program in an equipment specialist position, for which he received a certificate; and a lengthy history in mechanical work, including for over ten years at Nestlé.

(PRDSF ¶ 41.) According to Nestlé, this discrepancy in prior experience renders Kane an inpat comparator for Johnson's prima facie case.

Johnson's claim of differential treatment largely rests on the premise that Kane received better training during the probationary period. Yet to support this position, Johnson rarely cites specific evidence about Kane's own training, as would be required to carry his burden. *E.g.*, *Chen v. Yellen*, No. 3:14-CV-50164, 2021 WL 4226202, at *9 (N.D. Ill. Sept. 16, 2021), *aff'd*, No. 21-3110, 2023 WL 2967428 (7th Cir. Apr. 17, 2023). Alleged deficiencies in Johnson's own training do not alone indicate that Kane received better training, nor can the Court draw such an inference from a lack of evidence regarding Kane's training. *See Boardman v. Serv. Emps. Int'l Union*, 89 F.4th 596, 601 (7th Cir. 2023) ("Inferences supported only by speculation or conjecture are not sufficient to survive summary judgment.").

Further, to the extent Johnson and Kane did progress through the Training Program at different rates, the evidence indicates that their divergent experience levels were indeed the cause. One Operating Engineer, Richard Vazquez, testified that trainers "had to start with the basics with [Johnson]," unlike Kane—meaning the two necessarily received "different" training.

(LaSorsa Decl., Ex. G ("Vazquez Dep.") at 78:12–79:9, Dkt. No. 198-9.) And Johnson admits that each employee's training was individualized to some extent. (PRDSF ¶ 44.) Thus, even accepting that Kane's training was in certain respects more extensive than Johnson's training, this difference cannot satisfy the comparator element of the prima facie case because Johnson has not "eliminate[d] other possible explanatory variables"—specifically, Kane's advanced experience from the outset of the probationary period. *Crain*, 63 F.4th at 592 (internal quotation marks omitted). Likewise, that Kane received more positive feedback during the probationary period does not mandate a different conclusion in light of the ample evidence that Kane was the superior candidate. *Cf. Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (holding that prospective employees were not "sufficiently similarly situated for comparison purposes" when the plaintiff had performed worse during an interview than the proffered comparator).[5]

This is not the only theory Johnson proffers to satisfy his prima facie case, however; he separately points to Nestlé's treatment of the performance evaluations for Kane as evidence of favorable treatment. Kumlin testified that the "general rule" is that performance evaluations should be submitted prior to the close of the trainee's probationary period because it is easier to terminate him at that early stage. (Pl.'s Resp. Br., Ex. 2 ("Kumlin Dep.") at 113:3–114:24, Dkt. No. 204-2.) But while the Operating Engineers timely submitted Johnson's evaluations, some of them submitted Kane's evaluations only after his probationary period had closed. Johnson surmises that Kane would have stayed in the Training Program on a non-probationary basis no matter how negative the delayed evaluations had been. Moreover, though Johnson does not make this point himself, Kumlin testified that he reviewed the evaluations for Kane and Johnson at the

---

[5] Johnson also contends that Kane received counseling about the evaluation process, but the evidence he cites is too vague to indicate that the conversation in question amounted to favorable treatment sufficient to satisfy his prima facie burden. (LaSorsa Decl., Ex. E ("Kane Dep.") at 74:15–75:13, Dkt. No. 198-8.)

same time—meaning he did not look at any of Kane's evaluations until his probationary period had already concluded. (*Id.* at 175:4–176:6.)[6]

For purposes of the prima facie case, the Court may assume that the disparate timing of the performance evaluations satisfies the comparator prong. Kane's superior qualifications, along with his superior scores on the evaluations, are not material to *when* his evaluations should have been reviewed. *See Stinnett v. City of Chicago*, 630 F.3d 645, 647 (7th Cir. 2011) (focusing on the "relevant similarity" between the plaintiff and the comparator). In other words, there are arguably no "possible explanatory variables" aside from race to explain why the process of reviewing the evaluations for Kane was more lenient than the process for Johnson. *Crain*, 63 F.4th at 592 (internal quotation marks omitted). As such, whether this aspect of Kane's favorable treatment ultimately suggests discrimination is best suited for the pretext inquiry, below. *See Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) ("The similarly situated and pretext analysis often overlap, as comparator evidence and selective enforcement of an employer's rules are relevant to both inquiries.").

### III. Pretext

Even assuming Johnson can show a prima facie case of discrimination, he falters at the final step of the *McDonnell Douglas* framework. At that point, Johnson must show that Nestlé's proffered rationale for declining to admit him into the Training Program on a non-probationary basis—Johnson's poor performance—is pretext for discrimination. *Bragg*, 58 F.4th at 271. "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Brooks v. City of Pekin*, 95 F.4th 533, 539 (7th Cir. 2024)

---

[6] According to Kumlin, he mistakenly believed that Johnson and Kane started their probationary periods on the same date. (Kumlin Dep. at 174:10–175:3.) In fact, Kane started two weeks before Johnson. (PRDSF ¶¶ 24, 40.)

14

(internal quotation marks omitted). Thus, "it is of no moment if the employer's reasoning is incorrect, foolish, trivial or even baseless." *Avancez*, 39 F.4th at 436 (internal quotation marks omitted). "What ultimately matters is *causation*: the plaintiff must point to evidence that would allow a jury to find a connection between the statutorily protected factor (here, race) and the adverse action . . . ." *Groves v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022).

### A. Legitimate Expectations

At the outset, Johnson contends that Nestlé's rationale is pretext because his performance was, in reality, meeting Nestlé's legitimate expectations. This inquiry is a requirement of the prima facie case, but it is also relevant to pretext. *Avancez*, 39 F.4th at 435.

First, Johnson argues that Nestlé's explanation is suspect because it provided him with inadequate training during the probationary period. To that end, three of his performance evaluations indicate that the reviewing Operating Engineer thought Johnson was not receiving proper training. But Johnson does not dispute that even more Operating Engineers (five) had concluded his training was proper. He offers no reason to conclude that Nestlé's decision to rely on the latter, larger set of evaluations when assessing Johnson's performance was duplicitous. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) ("[T]he question is not whether the ratings were *right* but whether the employer's description of its reasons is *honest*." (internal quotation marks omitted)).

Johnson's cursory arguments regarding the allegedly subpar quality of training he received from one Operating Engineer in particular, John Hentz, do not tip the scales in his favor either. Most notably, Johnson admits that he "chose to be trained by" Hentz "because they were friends." (PRDSF ¶ 52).[7] And in any event, Johnson acknowledged during his deposition that he

---

[7] On top of that, the evidence that Hentz provided Johnson with inadequate training is dubious. Johnson cites the deposition of another Operating Engineer, Vazquez, for the proposition that Hentz was "not

received training from numerous Operating Engineers other than Hentz. (LaSorsa Decl., Ex. H ("Johnson Dep.") at 55:3–56:5, Dkt. No. 198-10.) Simply put, Johnson lacks the evidentiary support for his suggestion that his training was so poor that Nestlé could not have genuinely believed he should not advance in the Training Program for performance-related reasons. *See Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747–48 (7th Cir. 2021) (asking whether the employer's proffered rationale "was phony or intended to cover up more nefarious motives").

On a related note, Johnson contends that, if safety concerns about his performance had been legitimate, he would have been removed from the Training Program far earlier. After all, the Training Program was meant to teach employees to serve as Boiler Room Helpers. And there is no question that the position can involve hazardous work. But affording leeway to trainees while they are initially learning on the job hardly amounts to a "weakness[], implausibilit[y], inconsistenc[y], or contradiction[]" in Nestlé's account that would show pretext. *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019). To the contrary, the evidence suggests that such an opportunity to learn was the very purpose of the probationary period.

Last, Johnson takes issue with the methodology Nestlé used to review the performance evaluations, arguing that it should have weighted Hentz's favorable evaluation more heavily than others due to his extensive interactions with Johnson. This objection is beyond the scope of the Court's analysis. *See Liu v. Cook County*, 817 F.3d 307, 318 (7th Cir. 2016) (explaining that courts "do not sit as a super-personnel department[s], examining the wisdom of employers' business decisions"). In addition, Kumlin testified that he *did* place more weight on evaluations from Operating Engineers who had worked directly with Johnson; with respect to the other

---

feeding [Johnson] correct information." (DRPSF ¶ 26.) Yet even a generous reading of this testimony leaves serious doubts that Vazquez was referring to misinformation related to Johnson's training and not, for example, misinformation about the instant lawsuit. (Vazquez Dep. at 116:11–121:18.)

16

evaluations, Kumlin stated that the review process was "holistic" and that even individuals who had not worked as closely with Johnson could provide valuable input based on their indirect interactions with him. (Kumlin Dep. at 150:8–153:10.)[8] Absent opposing evidence, this process was at worst a poor means to assess Johnson's qualifications, which does not amount to pretext. *Avancez*, 39 F.4th at 436.[9]

### B. Timing of Evaluations

Johnson's final attempt to show pretext concerns the supposedly favorable treatment that Kane received compared to him. *See Khowaja*, 893 F.3d at 1015 (acknowledging the potential overlap between these inquiries). As discussed above, there is a colorable argument regarding favorable treatment so far as some Operating Engineers did not submit performance evaluations for Kane until after his probationary period ended, nor did Kumlin review the evaluations until then. "Evidence that the employer selectively enforced a company policy against" an employee in a protected class but not an employee outside it can speak to pretext. *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012).

To show pretext under such a theory, however, "there must be a regularly enforced specific policy." *Krnich v. FPC Corp.*, No. 19-CV-5358, 2021 WL 3930306, at *12 (N.D. Ill. Sept. 2, 2021). Here, Kumlin testified that "[t]here is no consequence" if an Operating Engineer

---

[8] Johnson argues that some reviews were completed by Operating Engineers who never worked with him whatsoever, ostensibly referring to John Lam. Nestlé agrees that Johnson and Lam did not work together. (DRPSF ¶ 30.) And Lam did leave a negative evaluation about Johnson. (Nestlé Forms at 15.) In his deposition, though, Johnson acknowledged that Lam had seen him interacting with a different Operating Engineer at one point. (Johnson Dep. at 93:21–94:11.) Additionally, Kumlin testified that all the Operating Engineers would have had contact with Johnson in contexts other than on-the-job training, such as during meetings. (Kumlin Dep. at 152:11–21.)

[9] To the extent Johnson suggests that Nestlé did not properly weigh Hentz's review because Hentz was the only black Operating Engineer, he fails to develop this argument and thus has waived it. *E.g.*, *Plemmons v. Rokey*, No. 3:18-CV-50389, 2024 WL 1435100, at *2 (N.D. Ill. Apr. 3, 2024).

does not submit an evaluation at all, much less if they submit it in an untimely fashion, and Johnson cites no evidence to dispute this assertion. (Kumlin Dep. at 111:4–12.) Thus, there is no evidence that Nestlé had an enforceable policy pursuant to which Operating Engineers needed to turn in evaluations before the end of a trainee's probationary period. It follows too that Kumlin's failure to review the evaluations while Kane was still on probationary status does not represent the sort of policy deviation sufficient to show pretext. *See Hentschel v. County of DuPage*, No. 21 C 6503, 2023 WL 7050023, at *5 (N.D. Ill. Oct. 26, 2023) ("[F]ailure precisely to follow internal guidelines – which already permit sidestepping – is not sufficient on its own to raise an inference of discriminatory intent.").

What is more, the timing of the performance evaluations does not change their substance. Johnson does not dispute that the evaluations for Kane were markedly more positive than his own. And apart from his suggestion that Operating Engineers would not have withheld any serious safety concerns until the evaluation forms, Johnson blames his low scores on his allegedly poor training rather than dishonest evaluators. (Pl.'s Resp. Br. at 22, Dkt. No. 204.) In these circumstances, any administrative misstep with respect to the timing of Kane's evaluations would not support an inference that the Operating Engineers were lying when they reported that Johnson's performance had been unsatisfactory—which is the nondiscriminatory rationale Nestlé offers for its decision. *Cf. Barnes-Staples v. Carnahan*, 88 F.4th 712, 717 (7th Cir. 2023) ("Nothing in the record suggests the [interviewers] thought anybody other than [the employee who was offered the job] was the best candidate at any point.").

## CONCLUSION

For the reasons explained above, Johnson has not carried his burden under the *McDonell Douglas* framework to show that Nestlé's proffered reason for his termination was pretext for

discrimination. The Court reaches the same conclusion under a holistic view of the evidence in accordance with *Ortiz*. In sum, Johnson has not presented sufficient evidence from which a reasonable jury could conclude that Nestlé discriminated against him based on his race. As a result, Nestlé's motion for summary judgment (Dkt. No. 188) is granted.

ENTERED:

Dated: September 27, 2024

Andrea R. Wood
United States District Judge